The NATIONAL ORGANIZATION FOR
The REFORM OF MARIJUANA LAWS
(NORML), et al., Plaintiffs,

v.

Griffin B. BELL, et al., Defendants.

Civ. A. No. 1897–73.

United States District Court,
District of Columbia.

Feb. 11, 1980.

Peter H. Meyers, Washington, D. C., for plaintiffs.

Allan P. MacKinnon, Dept. of Justice, Washington, D. C., for defendants.

Before TAMM, Circuit Judge, and ROBINSON and PARKER, JJ.

## OPINION

TAMM, Circuit Judge:

In this action, the National Organization for The Reform of Marijuana Laws (NORML or plaintiff) challenges the provisions of the Controlled Substances Act, 21 U.S.C. §§ 801–904 (1976) (CSA or Act), that prohibit the private possession and use of marijuana. Plaintiff asserts that the Act violates the Constitution's guarantees of privacy and equal protection and its prohibition against cruel and unusual punishment. Finding the Act to be a reasonable congressional attempt to deal with a difficult social problem, we . must reject this challenge and leave NORML to seek redress through political channels.

## I. The Litigation

NORML filed this action October 10, 1973,[1] seeking a declaratory judgment that the CSA and District of Columbia Uniform Narcotic Drug Act, D.C.Code §§ 33–401 to 425 (1973), are unconstitutional in prohibiting the private possession and use of marijuana and requesting a permanent injunction enjoining enforcement of those statutes.[2] This court stayed the proceedings for a year while NORML tried to obtain administrative relief through a proceeding to reclassify marijuana.[3] After the stay was vacated, the parties battled over preliminary motions for two years. Finally, in June 1978, this court heard five days of evidentiary hearings before Judge Aubrey

---

1. NORML requested a three-judge district court pursuant to 28 U.S.C. §§ 2281, 2282 (1970) (repealed 1976). This court granted the application March 12, 1974. Congress has since repealed this provision providing three-judge district courts to hear constitutional challenges to federal and state statutes. Act of Aug. 12, 1976, Pub.L. No. 94–381, §§ 1–2, 90 Stat. 1119.

2. Subject matter jurisdiction for the federal action exists under 28 U.S.C. §§ 1331(a) (1976) (general federal question jurisdiction), 1337 (1976) (jurisdiction for acts regulating commerce). This court concluded that it lacked subject matter jurisdiction over the District of Columbia defendants for want of the requisite amount in controversy and therefore dismissed that part of the complaint. *NORML v. Cullinane*, No. 1897–73 (D.D.C. May 5, 1976) (order dismissing suit as to D.C. defendants).

3. On May 18, 1972, NORML filed an application with the Attorney General to remove marijuana from control under the CSA or, in the alternative, to reclassify the drug in a different schedule. This endeavor continues today. The Drug Enforcement Administration (DEA) twice rejected these efforts at reclassification, citing American treaty obligations under the Single Convention on Narcotic Drugs, *opened for signature* Mar. 30, 1961, 18 U.S.T. 1407, 30 T.I.A.S. No. 6298, 520 U.N.T.S. 151 (Single Convention). The United States Court of Appeals for the District of Columbia Circuit reversed these determinations. *NORML v. DEA*, 182 U.S.App.D.C. 114, 559 F.2d 735 (D.C.Cir. 1977); *NORML v. Ingersoll*, 162 U.S.App.D.C. 67, 497 F.2d 654 (D.C.Cir. 1974). In the *DEA* case, the court directed the DEA to "refer the NORML petition to the Secretary of HEW for medical and scientific findings and recommendations for rescheduling, consistent with the requirements of the Single Convention." *NORML v. DEA*, 182 U.S.App.D.C. at 114, 559 F.2d at 735. On remand the DEA again declined to reclassify marijuana. 43 Fed.Reg. 36123 (1979). The Administrator of the DEA followed the recommendation of the Secretary of HEW that marijuana remain in Schedule I. *Id.* at 36127. NORML is appealing this ruling to the District of Columbia Circuit. *NORML v. DEA*, No. 79–1660 (D.C.Cir., filed June 27, 1979).

Robinson. Both sides presented live and documentary evidence concerning the effects of marijuana. Shortly thereafter, the parties submitted proposed findings of fact on the effects of marijuana and legal arguments for the court's consideration.

## II. The Controlled Substances Act

Congress passed the Comprehensive Drug Abuse Prevention and Control Act of 1970 (DAPCA), 21 U.S.C. §§ 801–966 (1976), to fight this nation's growing drug problem. The act was designed to

> deal in a comprehensive fashion with the growing menace of drug abuse in the United States (1) through providing authority for increased efforts in drug abuse prevention and rehabilitation of users, (2) through providing more effective means for law enforcement aspects of drug abuse prevention and control, and

> (3) by providing for an overall balanced scheme of criminal penalties for offenses involving drugs.

H.R.Rep. No. 1444, 91st Cong., 2d Sess. 1 [hereinafter cited as 1970 House Report], *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 4566, 4567. It ended the patchwork federal effort against drug abuse and signaled a national commitment to deal with this problem by committing federal funds for rehabilitation programs.[4]

In addition to the rehabilitation programs, DAPCA also revised completely the federal drug laws dealing with drug control.[5] Title II, called the Controlled Substances Act (CSA), establishes five schedules for classifying controlled substances according to specified criteria.[6] Two criteria—the potential for abuse and the medical applications of a drug—are the major bases

---

4. Title I of DAPCA deals with the rehabilitation of drug abusers and authorizes federal funds for treatment centers and drug abuse programs. Title II establishes controls and registration requirements for drugs, see text and notes at pp. 127–128 *infra*, while Title III regulates the import and export of controlled substances. H.R.Rep. No. 1444, 91st Cong., 2d Sess. 3–5 (1970) [hereinafter cited as 1970 House Report], *reprinted in* [1970] U.S.Code Cong. & Admin.News, pp. 4566, 4568–71.

5. Previous federal laws dealing with drug abuse included the Harrison Act, ch. 1, 38 Stat. 785 (1914) (repealed 1970), and the Marihuana Tax Act, ch. 553, 50 Stat. 551 (1937) (repealed 1970). For a discussion of federal efforts against drug abuse before passage of DAPCA, see Bonnie and Whitebread, *The Forbidden Fruit and the Tree of Knowledge: An Inquiry into the Legal History of American Marijuana Prohibition*, 56 Va.L.Rev. 976 (1970).

6. The criteria for the different schedules are:
(1) Schedule I.—
   (A) The drug or other substance has a high potential for abuse.
   (B) The drug or other substance has no currently accepted medical use in treatment in the United States.
   (C) There is a lack of accepted safety for use of the drug or other substance under medical supervision.
(2) Schedule II.—
   (A) The drug or other substance has a high potential for abuse.
   (B) The drug or other substance has a currently accepted medical use in treatment in the United States or a currently accepted medical use with severe restrictions.

   (C) Abuse of the drug or other substances may lead to severe psychological or physical dependence.
(3) Schedule III.—
   (A) The drug or other substance has a potential for abuse less than the drugs or other substances in schedules I and II.
   (B) The drug or other substance has a currently accepted medical use in treatment in the United States.
   (C) Abuse of the drug or other substance may lead to moderate or low physical dependence or high psychological dependence.
(4) Schedule IV.—
   (A) The drug or other substance has a low potential for abuse relative to the drugs or other substances in schedule III.
   (B) The drug or other substance has a currently accepted medical use in treatment in the United States.
   (C) Abuse of the drug or other substance may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in schedule III.
(5) Schedule V.—
   (A) The drug or other substance has a low potential for abuse relative to the drugs or other substances in schedule IV.
   (B) The drug or other substance has a currently accepted medical use in treatment in the United States.
   (C) Abuse of the drug or other substance may lead to limited physical dependence or psychological dependence relative to the drugs or other substances in schedule IV.
21 U.S.C. § 812(b).

for classification,[7] along with certain social and medical information. 21 U.S.C. §§ 811(c), 812(b).[8] Congress, on the basis of information gathered from extensive hearings,[9] made the initial classifications. Recognizing that scientific information concerning controlled substances would change, Congress empowered the Attorney General to hear petitions for the reclassification or removal of drugs from the schedules. *Id.* § 811.[10]

Congress also has revamped the penalties for distribution or possession of controlled substances. Heavy penalties—up to fifteen years and a $25,000 fine—are authorized for violators who manufacture or distribute Schedule I or II narcotic[11] drugs. 21 U.S.C. § 841(b)(1)(A). The manufacture or distribution of a nonnarcotic Schedule I or II substance, or a Schedule III drug, carries a possible five year and $15,000 penalty. *Id.* § 841(b)(1)(B). The penalties for violations involving Schedules IV and V are correspondingly lower. Penalties double for second offenses.

In setting the penalties, Congress sought to reduce drug abuse by deterring suppliers

through stiff penalties for drug distribution. Section 848 of DAPCA contains a special minimum term of ten years and a possible fine of $100,000 for anyone convicted of engaging in a "continuing criminal enterprise" involving five or more people in a series of drug violations. *Id.* § 848.[12] These heavier penalties for distribution, combined with strict registration requirements for manufacturers and researchers of Schedule I and II substances, *id.* §§ 821–29, are designed to reduce trafficking in dangerous drugs.

Penalties for possession are not so severe. Possession of any controlled substance carries a maximum sentence of one year and a $5,000 fine, with no distinctions being drawn among drugs in different schedules. These penalties again double for a second offense. None of these penalties are mandatory, however, and this flexibility lets a judge impose a sentence that takes account of individual circumstances. In addition, a court may place first offenders on probation for one year; upon successful completion of probation, court proceedings are dismissed without an adjudication of guilt, and the conviction is not placed on the individu-

7. *See* 1970 House Report, *supra* note 4, at 34, *reprinted in* [1970] U.S.Code Cong. & Admin. News at 4601; note 40 *infra.*

8. *See* note 41 *infra* for text of section 811(c).

9. The problem of drug abuse received considerable attention from Congress before passage of DAPCA in 1970. *See, e. g., Drug Abuse Control Amendments: Hearings on H.R. 11701 and H.R. 13743 Before the Subcomm. on Public Health and Welfare of the House Comm. on Interstate and Foreign Commerce,* 91st Cong., 2d Sess. (1970) (pts. 1 & 2).

10. When hearing petitions for reclassification or for the classification of new drugs, the Act directs the Attorney General to seek the advice of the Secretary of Health, Education, and Welfare regarding the medical and scientific properties of the drug, with such findings having a binding effect on the Attorney General. 21 U.S.C. § 811(b). *But cf.* 21 U.S.C. § 811(d) (Attorney General unilaterally may determine appropriate schedule for drug if treaty obligations are involved). This provision has been the subject of litigation involving NORML's application to reclassify marijuana. *See NORML v. DEA,* 182 U.S.App.D.C. 114, 559 F.2d 735 (D.C.Cir. 1977); note 3 *infra.*

11. Under the CSA, "narcotic drug" is defined to include any vegetable or chemical form of:

(A) Opium, coca leaves, and opiates.

(B) A compound, manufacture, salt, derivative, or preparation of opium, coca leaves, or opiates.

(C) A substance (and any compound, manufacture, salt, derivative, or preparation thereof) which is chemically identical with any of the substances referred to in clause (A) or (B).

21 U.S.C. § 802(16).

Under this definition, marijuana is not a narcotic. *Cf.* D.C.Code 33–401(m) (1973) (including cannabis within the legal definition of narcotic).

12. The House Report states that "section 408 is the only provision of the bill providing minimum mandatory sentences, and is intended to serve as a strong deterrent to those who otherwise might wish to engage in the illicit traffic, while also providing a means for keeping those found guilty of violations out of circulation." 1970 House Report, *supra* note 4, at 10, *reprinted in* [1970] U.S.Code Cong. & Admin.News at p. 4576.

al's record. *Id.* § 844(b)(1). A special provision places those dealing in a small amount of marijuana for no compensation under the possession penalties; thus, someone giving small amounts to friends is not subject to the stiff penalties for distribution. *Id.* § 841(b)(4).

## III. Marijuana

Marijuana (*cannabis sativa L.*) is a psychoactive drug made of the leaves, flowers, and stems of the Indian Hemp plant. It derives its psychoactive properties from delta-9-tetrahydrocannabinol (THC), which exists in varying concentrations in the plant, depending on its origin, growing conditions, and cultivation. Marijuana and Health: A Report to the Congress from the Secretary, Department of Health, Education, and Welfare 13–14 (1971) [hereinafter cited as 1971 HEW Report]. The concentration of THC within the sections of the plant also varies widely. The resin contains the greatest concentration of THC; smaller amounts are found, respectively, in the flowers, the leaves, and the stems. The most potent form of the drug, hashish, is prepared from the resins of the flowers and contains 5–12% THC. Marijuana generally found in the United States is weaker, with around 1% THC. National Commission on Marihuana and Drug Abuse, Marihuana: A Signal of Misunderstanding 50–51 (1972) [hereinafter cited as Signal of Misunderstanding].

The drug produces a number of physiological and psychological effects. The short-term physiological effects have been well documented. They are reddening of the whites of the eye, dryness in the mouth, increased pulse rate, and impaired motor responses.[13] Marihuana and Health: Fifth

Annual Report to the U.S. Congress from the Secretary of Health, Education, and Welfare 84 (1975) [hereinafter cited as 1975 HEW Report]; 1971 HEW Report, *supra* at 57–58. The short-term psychological effects are equally well known:

At low, usual "social" doses, the intoxicated individual may experience an increased sense of well-being; initial restlessness and hilarity followed by a dreamy, carefree state of relaxation; alteration of sensory perceptions including expansion of space and time; and a more vivid sense of touch, sight, smell, taste, and sound; a feeling of hunger, especially a craving for sweets; and subtle changes in thought formation and expression. To an unknowing observer, an individual in this state of consciousness would not appear noticeably different from his normal state.

At higher, moderate doses, these same reactions are intensified . . .. The individual may experience rapidly changing emotions, changing sensory imagery, dulling of attention, more altered thought formation and expression such as fragmented thought, flight of ideas, impaired immediate memory, disturbed associations, altered sense of self-identity and, to some, a perceived feeling of enhanced insight.

At very high doses, psychotomimetic phenomena may be experienced. These include distortions of body image, loss of personal identity, sensory and mental illusions, fantasies and hallucinations.

Signal of Misunderstanding, *supra* at 56. The intensity of these reactions depends on dosage, method of use, metabolism, attitude and setting, tolerance, duration of use, and pattern of use. *Id.* at 50–53.[14]

---

**13.** Impaired motor responses from marijuana use have been studied to determine the drug's effect on driving ability. The evidence now indicates that even social doses of the drug can impair seriously a driver's ability to handle an automobile. Marihuana and Health: Sixth Annual Report to the U.S. Congress From the Secretary of Health, Education, and Welfare 23 (1976) [hereinafter cited as 1976 HEW Report]. A related problem involving marijuana is that, unlike alcohol, there is no easy method of de-

termining whether one has recently used marijuana. Marihuana and Health: Fifth Annual Report to the U.S. Congress From the Secretary of Health, Education, and Welfare 3 (1975) [hereinafter cited as 1975 HEW Report]. Transcript, June 14, 1978, at 409–10 (testimony of Dr. Reese Jones).

**14.** Studies also indicate that users are able to "self-titrate," using only the amount needed to produce the desired intoxicated effect. *See* Tr.,

Experiences under marijuana intoxication are usually pleasurable, but negative reactions are not infrequent. *See id.* at 56. These negative reactions include distortion of body image, depersonalization, acute panic anxiety reaction, nausea, and, more rarely, psychosis. Marihuana and Health: Sixth Annual Report to the U.S. Congress from the Secretary of Health, Education, and Welfare 22–23 (1976) [hereinafter cited as 1976 HEW Report]; 1975 HEW Report, *supra* at 86–87; 1971 HEW Report, *supra* at 57. These reactions may be caused or exaggerated by pre-existing psychological problems. *See* 1976 HEW Report, *supra* at 21–22.

The long-term effects of marijuana are less well known. Studies have dispelled many of the myths about the drug: marijuana is not a narcotic, not addictive,[15] and generally not a stepping-stone to other, more serious drugs.[16] Furthermore, it causes neither aggressive behavior nor insanity. L. Grinspoon, Marijuana Reconsidered 230–322 (2d ed. 1977).

Despite these findings, questions about long-term use remain. Studies have indicated that marijuana may affect adversely the lungs and the endocrine, the immunity, and the cardiovascular systems. Some of these studies are disputed, *see* L. Grinspoon, *supra* at 376, but an examination of these adverse findings illustrates the important questions still remaining about marijuana use.

Smoking marijuana may contribute to lung disorders in the same way as tobacco. Marijuana smoke contains more tar than tobacco smoke, and the typical user inhales this smoke in his lungs and holds it there to derive the greatest effect from the THC. J. Graham, Cannabis and Health 283 (1976). The smoke irritates the lung tissue, and with heavy long-term use, may impair lung functions. 1976 HEW Report, *supra* at 14–15.

Marijuana may also affect the levels of the male sex hormone testosterone and other pituitary hormones. Several studies have found lower levels of testosterone after marijuana use. Even where lower testosterone levels were found, they were still within acceptable limits, 1976 HEW Report, *supra* at 15; L. Grinspoon, *supra* at 388–89, but the possibility of damage from long-term, heavy use still exists. Researchers are particularly concerned about marijuana's effects on pubertal males,[17] males with impaired sexual functioning, and pregnant women. 1975 HEW Report, *supra* at 81–82.

In a 1974 study, scientists found evidence that marijuana use impaired the functioning of the immunity system, causing a reduction in the white blood cell count. 1976 HEW Report, *supra* at 16. Later studies reached similar conclusions, 1975 HEW Report, *supra* at 110, while others have found no such reduction. More study of this question is needed, but conducting research in this and other areas involving physiological

June 12, 1978, at 33 (testimony of Dr. Lester Grinspoon); Tr., June 13, 1978, at 259 (testimony of Dr. Thomas Underleider).

**15.** Marijuana is not physically addictive, but some studies have found that long-term users develop a psychological addiction. 1975 HEW Report, *supra* note 13, at 91.

**16.** Clinical studies have failed to discover a relationship between use of marijuana and use of more addictive drugs such as heroin. These laboratory studies may fail to take account of the social and psychological pressures confronting marijuana users "on the street." Testifying before Congress, Doctor Robert W. Baird, director of the Haven Clinic, a narcotics rehabilitation center in Harlem, stated that use of marijuana provided youngsters a pleasurable introduction to the "drug culture"; after initial

experimentation with marijuana, young marijuana users were more willing to try stronger, more dangerous, substances. *Decriminalization of Marihuana: Hearings Before the House Select Committee on Narcotics Abuse and Control*, 95th Cong., 1st Sess. 423–38 (1977) (testimony of Dr. Robert W. Baird).

**17.** Concern over the effects of the drug on pubertal males is growing as the age of the marijuana users drops. Studies now show that marijuana use is commonplace among adolescents. In a 1977 survey, 30% of all 12–17 year olds and 60% of all 18–25 year olds indicated that they had used marijuana. Marihuana and Health: Seventh Annual Report to the U.S. Congress From the Secretary of Health, Education, and Welfare 5–9 (1977).

changes from marijuana is extremely difficult, for researchers cannot even agree on appropriate procedures. *See* L. Grinspoon, *supra* at 389.

Marijuana affects the cardiovascular system by accelerating the heart rate. Studies also indicate that it may weaken temporarily contractions of heart muscle, posing dangers for smokers with heart disease or abnormalities. 1976 HEW Report, *supra* at 14. Studies on healthy young men have revealed no cardiovascular effects, but those with heart problems may experience pain due to less efficient delivery of oxygen in the blood. 1975 HEW Report, *supra* at 80. The long-range consequences of these temporary changes in the cardiovascular system are difficult to assess, but they may be significant and require further study.

In addition to these problems, other tests have found negative aspects to marijuana use. Amotivational difficulties and changes in brain cells, chromosomes, and cell metabolism have been noted in various studies. 1976 HEW Report, *supra* at 16–20; 1975 HEW Report, *supra* at 82–83; Signal of Misunderstanding, *supra* at 61–65. These findings have not been corroborated, however, and other research has reached contradictory conclusions. *See* L. Grinspoon, *supra* at 54, 287–90, 387, 390–91. As with the other areas, these questions demand further scientific study to determine conclusively the long-term effects of marijuana. Although we now know that marijuana is not the "killer" drug, as branded in the past, its long-term effects are still an open question

and must be approached as unresolved. These lingering questions must be kept in mind in considering the legal issues.

IV. Legal Issues

A. *Right of Privacy*

NORML first contends the prohibition on the private possession and use of marijuana violates the constitutional rights of privacy in one's home, *see Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), and individual autonomy, *see Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). These rights, being fundamental, receive the highest constitutional protection and must prevail over governmental restrictions unless the government can demonstrate "a compelling state interest," *Kramer v. Union Free School District No. 15*, 395 U.S. 621, 627, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969). In NORML's view, no rational basis exists for the marijuana prohibition, and therefore the statute must be declared invalid.

In weighing this claim, this court must examine the roots of this modern concept of privacy.[18] The Supreme Court first discussed privacy as a constitutional right in *Griswold v. Connecticut*. In that case, the Court struck down a Connecticut statute prohibiting the use of contraceptives by married couples. Justice Douglas, in his opinion for the Court, stated that a right of privacy exists in the "penumbras" of the Bill of Rights,[19] 381 U.S. at 484, 85 S.Ct. at

18. Plaintiff argues that a related right of personal autonomy is also fundamental under the Constitution. It cites to support this proposition Justice Brandeis's famous dissent in *Olmstead v. United States*, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928):

The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the

most comprehensive of rights and the right most valued by civilized [man].

This right of personal autonomy and the general right of privacy are closely related, and they will be discussed under the broader framework of the right of privacy.

19. Justice Douglas wrote:

[S]pecific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance. Various guarantees create zones of privacy. The right of association contained in the penumbra of the First Amendment is one . . . . The Fourth Amendment explicitly affirms the "right of the people to be secure in their persons, houses,

1681, and that marriage falls "within the zone of privacy created by several fundamental constitutional guarantees," *id.* at 485, 85 S.Ct. at 1682. The Court, however, gave no indication as to the extent of this marital right of privacy.

In *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Court struck down state statutes prohibiting abortions in the early stages of pregnancy. Justice Blackmun, in his majority opinion, noted that "[t]he Constitution does not explicitly mention any right of privacy." *Id.* at 152, 93 S.Ct. at 726. Nonetheless, "the Court has recognized that a right of personal privacy, or a guarantee of certain areas or zones of privacy does exist under the Constitution." *Id.* On the question of abortion, the Court decided this privacy right was "broad enough to encompass a woman's decision whether or not to terminate her pregnancy," *id.* at 153, 93 S.Ct. at 727.

This right of privacy is not absolute, however.[20] Justice Blackmun made clear that this right includes only those "personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty . . . .' " *Id.* at 152, 93 S.Ct. at 726 (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)). The Court expressly has recognized as fundamental those rights regarding familial concerns and obligations: marriage, *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); contraception, *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); child rearing, *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); procreation, *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); familial living arrangements, *Moore v. City of East Cleve-*

*land,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (plurality opinion).

In *Stanley v. Georgia,* the Supreme Court based the right of privacy on the first amendment right to receive information and a right of privacy in the home. At issue in *Stanley* was the possession of obscene materials that fell outside first amendment protection under *Roth v. United States,* 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Nevertheless, the Court held that their possession in the home was protected.

> This right to receive information and ideas, regardless of their social worth, . . . is fundamental to our free society. Moreover, in the context of this case—a prosecution for mere possession of printed or filmed matter in the privacy of a person's own home—that right takes on an added dimension. For also fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy.

394 U.S. at 564, 89 S.Ct. at 1247–48 (citation omitted).

The Court concluded:

> If the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch. Our whole constitutional heritage rebels at the thought of giving government the power to control men's minds.

*Id.* at 565, 89 S.Ct. at 1248.

The Supreme Court defined the contours of *Stanley* and this right of privacy in the home in four subsequent pornography decisions, *United States v. Orito,* 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973), *United*

---

papers, and effects, against unreasonable searches and seizures." The Fifth Amendment in its Self-Incrimination Clause enables the citizen to create a zone of privacy which government may not force him to surrender to his detriment. The Ninth Amendment provides: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

*Griswold v. Connecticut,* 381 U.S. at 484, 85 S.Ct. at 1681.

**20.** "[T]he right of personal privacy includes the abortion decision, but . . . this right is not unqualified and must be considered against important state interests in regulation." *Roe v. Wade,* 410 U.S. at 154, 93 S.Ct. at 727. These interests justify prohibitions on abortions once the fetus is viable, *id.* at 163–64, 93 S.Ct. at 731–32.

*States v. 12 200-ft. Reels of Super 8mm. Film,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973), *Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973), and *United States v. Reidel,* 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971). In these cases, the Court declined to expand this concept of privacy; instead it construed the right strictly to apply only to the home. The Court refused to find any concurrent right to transport obscene materials across state lines for personal use, *United States v. Orito,* 413 U.S. at 142–43, 93 S.Ct. at 2677, to import obscene items for personal use, *United States v. 12 200-ft. Reels of Super 8mm. Film,* 413 U.S. at 128, 93 S.Ct. at 2668, or to distribute obscene materials, *United States v. Reidel,* 402 U.S. at 356, 91 S.Ct. at 1412. According to the Court, the right of " 'privacy of the home' . . . was hardly more than a reaffirmation that 'a man's home is his castle,' " *Paris Adult Theatre I v. Slaton,* 413 U.S. at 66, 93 S.Ct. at 2640. As such, it receives "special safeguards," *United States v. Orito,* 413 U.S. at 142, 93 S.Ct. at 2677, but the protection "is restrict-

ed to a place, the home." *Paris Adult Theatre I v. Slaton,* 413 U.S. at 66 n.13, 93 S.Ct. at 2640 n.13.

■ NORML argues that this right of privacy in general and privacy in the home forbids any governmental ban on private possession and use of marijuana. Such a reading stretches the right of privacy too far. This right exists only in conjunction with specific constitutional guarantees that serve as the substantive basis for the privacy right, *Paul v. Davis,* 424 U.S. 693, 712–13, 96 S.Ct. 1155, 1165–66, 47 L.Ed.2d 405 (1976).[21] The recognized substantive rights are " 'fundamental' or 'implicit in the concept of ordered liberty,' " *id.* at 713, 96 S.Ct. at 1166 (citation omitted), and "[t]he activities detailed as being within this definition . . . relat[e] to marriage, procreation, contraception, family relationships, and child rearing and education." *Id.*[22]

■ Smoking marijuana does not qualify as a fundamental right, *Ravin v. State,* 537 P.2d 494, 502 (Alaska 1975) (dictum).[23] In

**21.** These rights are derived from the first amendment, *Stanley v. Georgia, discussed at* pp. 131–132 *supra*; the fourth and fifth amendments, *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); the ninth amendment, *Griswold v. Connecticut,* 381 U.S. 479, 486, 85 S.Ct. 1678, 1682, 14 L.Ed.2d 510 (Goldberg, J., concurring); the "penumbras" of the Bill of Rights, *Griswold v. Connecticut, discussed at* pp. 130–131 *supra*; or those rights "implicit in the concept of ordered liberty," *Palko v. Connecticut,* 302 U.S. at 324, 58 S.Ct. at 151. *See Roe v. Wade,* 410 U.S. at 152, 93 S.Ct. at 726.

**22.** The Supreme Court in *Runyon v. McCrary,* 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), noted the relationship between the fundamental familial rights and the right of privacy:

The *Meyer-Pierce-Yoder* [*Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)] "parental" right and the privacy right . . . may be no more than verbal variations of a single constitutional right. See *Roe* v. *Wade,* 410 U.S. 113, 152–153, 93 S.Ct. 705, 726–727, 35 L.Ed.2d 147 (citing *Meyer* v. *Nebraska* and *Pierce* v. *Society of Sisters* for the proposition that this

Court has recognized a constitutional right of privacy).

*Id.* at 178 n.15, 96 S.Ct. at 2598 n.15.

**23.** NORML relies heavily on *Ravin v. State,* 537 P.2d 494 (Alaska 1975) to support its contention that smoking marijuana is a fundamental right. The Alaska Supreme Court, finding a special right of privacy in the home, struck down the state marijuana statute, Alaska Stat. § 17.12.010 (1975), as it applied to private use of marijuana in the home. The Alaska court upheld the prohibition on marijuana use while operating a motor vehicle, but it could find "no adequate justification for the state's intrusion into the citizen's right to privacy [in] its prohibition of possession of marijuana by an adult for personal consumption in the home." 537 P.2d at 511. The Alaska court based its ruling on a new provision of the state constitution that explicitly guarantees a right of privacy. Alaska Const. art. I, § 22. *See* 537 P.2d at 504. Without that constitutional provision, no such right would exist:

Assuming this court were to continue to utilize the fundamental right-compelling state interest test in resolving privacy issues under article I, section 22 of Alaska's constitution, we would conclude that there is not a fundamental constitutional right to possess or ingest marijuana in Alaska. For in our view, the right to privacy amendment to the Alaska

ascertaining whether a right is fundamental, a court must determine whether the right is "explicitly or implicitly guaranteed by the Constitution." *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 33–34, 93 S.Ct. 1278–1297, 36 L.Ed.2d 16 (1973). On this issue, Justice Stewart once noted:

> The Court . . . does *not* "pick out particular human activities, characterize them as 'fundamental,' and give them added protection * * * ." To the contrary, the Court simply recognizes, as it must, an established constitutional right, and gives to that right no less protection than the Constitution itself demands.

*Shapiro v. Thompson,* 394 U.S. 618, 642, 89 S.Ct. 1322, 1335, 22 L.Ed.2d 600 (Stewart, J., concurring). Smoking marijuana receives no explicit or implicit constitutional protection. The act of smoking does not involve the important values inherent in questions concerning marriage, procreation, or child rearing. Moreover, its use predominantly as a "recreational drug" [24] undercuts any argument that its use is as important as, *e.g.,* use of contraceptives, *see Eisenstadt v. Baird, discussed at* p. 131 *supra.*[25] As the Alaska Supreme Court noted in discussing a right to private use of marijuana, "[f]ew would believe they have been deprived of something of critical importance if deprived of marijuana." *Ravin v.*

*State,* 537 P.2d at 502. Private possession of marijuana, not being what Justice Stewart called an "established constitutional right," cannot be deemed "fundamental." [26]

■ NORML tries to bootstrap the *Stanley* right of privacy in the home into a fundamental right that protects all activities taking place therein. This reading reverses the proper analysis. The home offers refuge for activities grounded in other protected rights. The right protected in *Stanley* was the first amendment right to read and receive information even if the information itself was not constitutionally protected. *Stanley v. Georgia,* 394 U.S. at 564–66, 89 S.Ct. at 1247–48. Without that first amendment right at issue, *Stanley* would have no right to privacy in the home. The Court specifically stated:

> What we have said in no way infringes upon the power of the State or Federal Government to make possession of other items, such as narcotics, firearms, or stolen goods, a crime. Our holding in the present case turns upon the Georgia statute's infringement of fundamental liberties protected by the First and Fourteenth Amendments. No First Amendment rights are involved in most statutes making mere possession criminal.

*Id.* at 568 n.11, 89 S.Ct. at 1249–50 n.11.[27] Finding no fundamental right to private

---

Constitution cannot be read so as to make the possession or ingestion of marijuana itself a fundamental right. *Id.* at 502. This admission in *Ravin* that private use of marijuana is not a fundamental right and the special reliance on the Alaska Constitution do not support NORML's position.

**24.** The Shafer Commission noted: "In short, persons who initiate use of marihuana generally do so out of curiosity and the desire for fun, excitement or 'kicks.' . . . Those who continue to use the drug . . . do so for the most part because they have enjoyed the experience." National Comm'n on Marihuana and Drug Abuse, Marihuana: A Signal of Misunderstanding app. vol. 1, at 265 (1972) (technical papers).

**25.** The Supreme Court has refused to find any right of private possession of other intoxicants

such as alcohol. *Crane v. Campbell,* 245 U.S. 304, 38 S.Ct. 98, 62 L.Ed. 304 (1917).

**26.** In other cases, the Court has refused to find a right of privacy in the absence of some fundamental interest. *See Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (no right of privacy in one's reputation); *Doe v. Commonwealth's Attorney,* 403 F.Supp. 1199 (E.D.Va.1975), *aff'd mem.,* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976) (upholding statute forbidding consensual homosexual relations in private).

**27.** NORML argues that the Court's reference to "narcotics" does not include marijuana, a non-narcotic drug. Brief for Plaintiff at 10. The distinction is unpersuasive. The footnote merely restates the proposition that a constitutional right must be involved for there to be a right of privacy in the home.

use and possession of marijuaná, this court must reject NORML's privacy claim.[28]

## B. *Equal Protection*

■ NORML further contends that the CSA violates the equal protection component of the due process clause.[29] First, it argues that the classification of marijuana, a relatively harmless drug, as a controlled substance violates equal protection. Second, NORML believes that, even if marijuana may be controlled, its classification as a Schedule I drug is infirm: placement in Schedule I is both underinclusive in failing to include as a controlled substance drugs such as alcohol and nicotine, which satisfy Schedule I criteria, and overinclusive for establishing the same penalties for possession of marijuana as for all other controlled substances and for including marijuana in Schedule I with the more dangerous narcotics and opiates. For the reasons stated below, this court rejects these contentions.

■ Legislation that does not affect a "fundamental"[30] right or a "suspect" class need only bear a rational relationship to a legitimate state interest.

The distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end and will be set aside as violative of the Equal Protection Clause only if based on reasons totally unrelated to the pursuit of that goal. Legislatures are presumed to have acted constitutionally even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classification will be set aside only if no grounds can be conceived to justify them.

*McDonald v. Board of Election Commissioners,* 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969). This standard of judicial review gives legislatures wide discretion and permits them to attack problems in any rational manner. *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). "In an equal protection case of this type . . ., those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 950, 59 L.Ed.2d 171 (1979). The classification will be upheld unless "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational." *Id.* at 97, 99 S.Ct. at 943. "In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed

---

**28.** Cases rejecting plaintiff's argument that private possession of marijuana is a fundamental or constitutional right include: *United States v. Drotar,* 416 F.2d 914 (5th Cir. 1969), *vacated on other grounds,* 402 U.S. 939, 91 S.Ct. 1628, 29 L.Ed.2d 107 (1971); *Louisiana Aff. of NORML v. Guste,* 380 F.Supp. 404 (E.D.La.1974), *aff'd,* 511 F.2d 1400 (5th Cir.), *cert. denied,* 423 U.S. 867, 96 S.Ct. 129, 46 L.Ed.2d 96 (1975); *United States v. Maiden,* 355 F.Supp. 743 (D.Conn. 1973); *State v. Murphy,* 117 Ariz. 57, 570 P.2d 1070 (1977); *In re Klor,* 64 Cal.2d 816, 51 Cal.Rptr. 903, 415 P.2d 791 (1966); *People v. Aguiar,* 257 Cal.App.2d 597, 65 Cal.Rptr. 171, *cert. denied,* 393 U.S. 970, 89 S.Ct. 411, 21 L.Ed.2d 383 (1968); *State v. Anonymous,* 32 Conn.Sup. 324, 355 A.2d 729 (1976); *Laird v. State,* 342 So.2d 962 (Fla.1977); *Borras v. State,* 229 So.2d 244 (Fla.1969), *cert. denied,* 400 U.S. 808, 91 S.Ct. 70, 27 L.Ed.2d 37 (1970); *Blincoe v. State,* 231 Ga. 886, 204 S.E.2d 597 (1974); *State v. Renfro,* 56 Haw. 501, 542 P.2d 366 (1975); *State v. Baker,* 56 Haw. 271, 535 P.2d 1394 (1975); *Marcoux v. Attorney Gen.,* Mass., 375 N.E.2d 688 (1978); *Commonwealth v. Leis,* 355 Mass. 189, 243 N.E.2d 898 (1969); *State v. Kells,* 199 Neb. 374, 259 N.W.2d 19 (1977); *State v. Anderson,* 16 Wash.App. 553, 558 P.2d 307 (1976).

**29.** The due process clause of the fifth amendment requires that federal legislation satisfy the same standards of equal protection of the law that are guaranteed by the fourteenth amendment. *See Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."); *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

**30.** *See* the discussion of fundamental rights at pp. 130–133 of text *supra.*

along suspect lines . . . ." *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976).

### 1. Classification as a Controlled Substance

■ The inclusion of marijuana as a controlled substance under the CSA easily satisfies this deferential rationality standard. Congress gave the CSA provisions concerning marijuana considerable attention. It recognized that much of the information regarding marijuana was inaccurate [31] and that bias and ignorance had perpetuated many myths about the consequences and dangers of marijuana use. Despite all the concern over the drug, few reliable scientific studies existed that could give accurate information to the legislators. Representative Cohelan acknowledged this lack of accurate information on marijuana during the House discussion of the bill: "Much remains to be done to find out the effects of marijuana. Assertions from both sides are not hard to find, but there is precious little hard clinical data on this subject." 116 Cong. Rec. 33658 (1970). Unsure of marijuana's effects, Congress placed marijuana in Schedule I, with its program of strict controls, until it could obtain more scientific information on the drug's effects. In so doing, Congress followed the recommendation of the Department of Health, Education, and Welfare, which had suggested classification in Schedule I until further tests could be completed.[32]

---

**31.** Doctor Stanley Yolles, testifying before the House Committee on Interstate and Foreign Affairs, submitted a chart contrasting popularly believed myths with the scientific evidence on marijuana. The chart reflected the state of knowledge about the drug that prevailed when he spoke in 1970.

| FABLE | FACT |
|---|---|
| 1. Marihuana is a narcotic. | 1. Marihuana is not a narcotic except by statute. Narcotics are opium or its derivations (like some synthetic chemicals with opium-like activity). |
| 2. Marihuana is addictive. | 2. Marihuana does not cause physical addiction, since tolerance to its effects and symptoms on sudden withdrawals does not occur. It can produce habituation (psychological dependence). |
| 3. Marihuana causes violence and crime. | 3. Persons under the influence of marihuana tend to be passive. It is true that sometimes a crime may be committed by a person while under the influence of marihuana. However, any drug which loosens one's self-control is likely to do the same and relates primarily to the personality of the user. |
| 4. Marihuana leads to increase in sexual activity. | 4. Marihuana has no aphrodisiac property. |
| 5. Marihuana is harmless. | 5. Instances, of acute panic, depression, and psychotic states are known, although they are infrequent. Certain kinds of individuals can also become over-involved in marihuana use and can lose their drive. We do not |

| FABLE | FACT |
|---|---|
| | know the effects of long-term use. |
| 6. Occasional use of marihuana is less harmful than occasional use of alcohol. | 6. We do not know. Research on the effects of various amounts of each drug for various periods is underway. |
| 7. Marihuana use leads to heroin. | 7. We know of nothing in the nature of marihuana that predisposes to heroin abuse. It is estimated that less than 5% of chronic users of marihuana go on to heroin use. |
| 8. Marihuana enhances creativity. | 8. Marihuana might bring fantasies of enhanced creativity but they are illusory, as are "instant insights" reported by marihuana users. |
| 9. More severe penalties will solve the marihuana problem. | 9. Marihuana use has increased enormously in spite of the most severely punitive laws. |
| 10. It is safe to drive while under the influence of marihuana. | 10. Driving under the influence of any intoxicant is hazardous. |

1970 House Report, *supra* note 4, at 12–13, *reprinted in* [1970] U.S.Code Cong. & Admin. News at 4577–78.

**32.** This recommendation came in a letter stating:

Some question has been raised whether the use of the plant itself produces "severe psychological or physical dependence" as required by a schedule I or even a schedule II criterion. Since there is still a considerable void in our knowledge of the plant and effects of the active drug contained in it, our recommendation is that marijuana be retained within schedule I at least until the completion of certain studies now underway

Inclusion of marijuana as a controlled substance in 1970 certainly was rational. The information then available indicated that marijuana might well have substantial detrimental effects,[33] and Congress thus reasonably could decide to include the drug as a controlled substance rather than leave it unregulated. NORML argues that, although classification of marijuana as a controlled substance in 1970 might have been rational, the scientific evidence available today establishes that "private possession and use of marijuana by adults [do] not pose any significant danger to the public health, safety or welfare." Brief for Plaintiff at 18. NORML therefore asserts the classification of marijuana as a controlled substance is no longer rational and invokes *United States v. Carolene Products Co.*, 304 U.S. 144, 153, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938): "the constitutionality of a statute predicated upon a particular state of facts may be challenged by a showing to the court that those facts have ceased to exist." (citation omitted). *See also Abie State Bank v. Bryan*, 282 U.S. 765, 51 S.Ct. 252, 75 L.Ed. 690 (1931).

The record, however, is not so clear as NORML contends. Experts still strongly disagree about the safety of marijuana, and its long-term effects remain an open question. Studies indicate that marijuana may impair the circulatory, the endocrine, and the immunity systems of the body, alter chromosomes, and change cell metabolism.[34]

Although many dispute these findings, this contradictory evidence demonstrates that important questions about marijuana use persist.

Given the continuing debate over marijuana, this court must defer to the legislature's judgments on disputed factual issues. In the *Carolene Products* decision on which NORML relies, the Supreme Court recognized the importance of this policy of judicial restraint:

> [I]nquiries, where the legislative judgment is drawn in question, must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for [the classification]. Here the demurrer challenges the validity of the statute on its face and it is evident from all the considerations presented to Congress, and those of which we may take judicial notice, that the question is at least debatable . . . . As that decision was for Congress, neither the findings of a court arrived at by weighing the evidence, nor the verdict of a jury can be substituted for it.

304 U.S. at 154, 58 S.Ct. at 784–85. The classification need not change continually as more information becomes available. Congressional action must be upheld as long as a rational basis still exists for the classification. The continuing questions about marijuana and its effects make the classification rational.

to resolve this issue. If those studies make it appropriate for the Attorney General to change the placement of marijuana to a different schedule, he may do so in accordance with the authority provided . . . .

Letter from Dr. Roger O. Egeberg, Assistant Sec'y for Health and Scientific Affairs, Dep't of HEW, to Hon. Harley O. Staggers, Chairman, House Comm. on Interstate and Foreign Commerce, *reprinted in* 1970 House Report, *supra* note 4, at 61; [1970] U.S.Code Cong. & Admin. News at 4629–30.

In an effort to secure more information about marijuana, Congress, in section 601 of DAPCA, established the Commission on Marihuana and Drug Abuse to study marijuana use and its effects. The Commission, headed by Governor Raymond P. Shafer, issued its report, Marihuana: A Signal of Misunderstanding, in 1972. The Commission recommended that fed-

eral and state penalties for private possession of marijuana be eliminated and that governmental efforts should focus on discouraging marijuana use. *Signal of Misunderstanding* 134–38, 151–60.

33. *See, e.g.*, Talbott & Teague, *Marihuana Psychosis—Acute Toxic Psychosis Associated With the Use of Cannabis Derivatives*, 210 A.M.A.J. 299–302 (1969), *reprinted in* 116 Cong.Rec. 1650–52 (1970). According to Senator Dodd, who introduced this report into the Congressional Record during the debate over marijuana, the report documented cases of "marijuana psychosis" and demonstrated that "terrible consequences" could result from use of marijuana. 116 Cong. Rec. at 1653.

34. *See* discussion of marijuana's effects at pp. 128–130 *supra*.

Furthermore, judicial deference is appropriate when difficult social, political, and medical issues are involved. Courts should not step in when legislators have made policy choices among conflicting alternatives. That this court might resolve the issues differently is immaterial. "When Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation, even assuming, *arguendo*, that judges with more direct exposure to the problem might make wiser choices." *Marshall v. United States*, 414 U.S. 417, 427, 94 S.Ct. 700, 706, 38 L.Ed.2d 618 (1974). Thus, this court should not substitute its judgment for the reasonable determination made by Congress to include marijuana under the CSA.[35]

### 2. Classification in Schedule I

In a related equal protection challenge, NORML argues that classification of marijuana in Schedule I is irrational as being both underinclusive and overinclusive. The CSA does not regulate alcohol and tobacco, which are more harmful than marijuana, and it places marijuana in the same schedule with such dangerous substances as heroin and other narcotics. Thus, even if the classification of marijuana as a controlled substance is rational, the plaintiff believes that the legislation nonetheless is unconstitutional because marijuana's treatment within the Act is irrational in relation to other controlled substances.

### a. *Underinclusiveness*

■ "Underinclusive classifications do not include all who are similarly situated with respect to a rule, and thereby burden

less than would be logical to achieve the intended government end." L. Tribe, American Constitutional Law, § 16–4, at 997 (1978). To be successful in a challenge based on underinclusiveness, plaintiff must show that the governmental choice is " 'clearly wrong, a display of arbitrary power, not an exercise of judgment,' " *Mathews v. de Castro*, 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976) (quoting *Helvering v. Davis*, 301 U.S. 619, 640, 57 S.Ct. 904, 908, 81 L.Ed. 1307 (1937)). Few challengers can sustain such a heavy burden of proof. Courts have recognized the very real difficulties under which legislatures operate— difficulties that arise due to the nature of the legislative process and the society that legislation attempts to reshape. As Professor Tribe has explained: "underinclusive" or "piecemeal legislation is a pragmatic means of effecting needed reforms, where a demand for completeness may lead to total paralysis . . . ." L. Tribe, *supra* § 16–4, at 997.

■ Legislatures have wide discretion in attacking social ills. "A State may 'direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed.' " *Hughes v. Superior Court*, 339 U.S. 460, 468, 70 S.Ct. 718, 723, 94 L.Ed. 985 (1950) (quoting *Central Lumber Co. v. South Dakota*, 226 U.S. 157, 160, 33 S.Ct. 66, 67, 57 L.Ed. 164 (1912)). Failure to address a certain problem in an otherwise comprehensive legislative scheme is not fatal to the legislative plan.

---

**35.** Several federal courts have considered and rejected equal protection attacks on the CSA. *See United States v. Kiffer*, 477 F.2d 349 (2d Cir.), *cert. denied*, 414 U.S. 831, 94 S.Ct. 62, 38 L.Ed.2d 65 (1973); *United States v. Rodriguez-Camacho*, 468 F.2d 1220 (9th Cir. 1972), *cert. denied*, 410 U.S. 985, 93 S.Ct. 1512, 36 L.Ed.2d 182 (1973); *Louisiana Aff. of NORML v. Guste*, 380 F.Supp. 404 (E.D.La.1974), *aff'd mem.*, 511 F.2d 1400 (5th Cir.), *cert. denied*, 423 U.S. 867, 96 S.Ct. 129, 46 L.Ed.2d 96 (1975); *United States v. LaFroscia*, 354 F.Supp. 1338 (S.D.N.Y.), *aff'd*, 485 F.2d 457 (2d Cir. 1973); *United States v. Maiden*, 355 F.Supp. 743 (D.Conn.

1973). State courts generally have upheld state marijuana laws against equal protection challenges. *See State v. Murphy*, 117 Ariz. 57, 570 P.2d 1070 (1977); *People v. McKenzie*, 169 Colo. 521, 458 P.2d 232 (1969); *United States v. Thorne*, 325 A.2d 764 (D.C.App.1974); *Raines v. State*, 225 So.2d 330 (Fla.1969); *Blincoe v. State*, 231 Ga. 886, 204 S.E.2d 597 (1974); *State v. Renfro*, 56 Haw. 501, 542 P.2d 366 (1975); *State v. Baker*, 56 Haw. 271, 535 P.2d 1394 (1975); *Marcoux v. Attorney Gen.*, Mass., 375 N.E.2d 688 (1978); *Commonwealth v. Leis*, 355 Mass. 189, 243 N.E.2d 898 (1969); *State v. Kells*, 199 Neb. 374, 259 N.W.2d 19 (1977).

[A] legislature traditionally has been allowed to take reform "one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind," *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955); and a legislature need not run the risk of losing an entire remedial scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked.

*McDonald v. Board of Election Commissioners*, 394 U.S. at 809, 89 S.Ct. at 1409.

■■■ Given this policy of legislative freedom in confronting social problems, the exclusion of alcohol and tobacco from the CSA does not render the scheme unconstitutional. Different legislative schemes control the sale and distribution of alcohol and tobacco, *see, e. g.*, 26 U.S.C. §§ 5661(b), 5681, 5683, 5686 (1976). The specific exemption of alcohol and tobacco from the provisions of the CSA, 21 U.S.C. § 802(6) (1976), reflects Congress's view that other regulatory schemes are more appropriate for alcohol and tobacco.[36] That alcohol and tobacco may have adverse effects on health does not mean the CSA is the only proper means of regulating these drugs, nor does it mean that marijuana should be treated identically. As a Presidential commission on drug abuse pointed out, "While alcoholism constitutes a major social problem, surely it is not valid to justify the adoption of a new abuse on the basis that it is no worse than a presently existing one. The result could only be added social damage from a new source." Task Force Report: Narcotics, Marijuana, and Dangerous Drugs (1969), *reprinted in* 115 *Cong.Rec.* 25454, 25456

(1969). Congress, having the power to deal with drug abuse in any reasonable manner, decided to exclude alcohol and tobacco from the CSA. This court will not disturb that judgment.

b. *Overinclusiveness*

A law also may be challenged for including within a prohibited class an item that does not rationally belong with the other members of that class. NORML once again draws its support from the *Carolene Products* decision:

[T]he constitutionality of a statute, valid on its face, may be assailed by proof of facts tending to show that the statute as applied to a particular article is without support in reason because the article, although within the [particular] class, is so different from others of the class as to be without the reason for the prohibition.

*United States v. Carolene Products Co.*, 304 U.S. at 153–54, 58 S.Ct. at 784. The plaintiff here argues that penalties for possession of marijuana should be lower than those authorized for other, more dangerous Schedule I drugs. Moreover, NORML contends marijuana's classification in Schedule I is impermissible because the drug does not fit the statutory criteria for placement in that schedule.

1) *Penalties*

■■■ The "rational basis" test governs this challenge to the relative severity of penalties under the CSA. *See Duffy v. Wells*, 201 F.2d 503, 506 (9th Cir. 1952), *cert. denied*, 346 U.S. 861, 74 S.Ct. 74, 98 L.Ed. 373 (1953). Under this analysis, the penalty scheme is not irrational.[37] Congress, in es-

---

**36.** In discussing the regulation of alcohol and tobacco, one district court observed: "The legislative judgment concerning alcohol and nicotine may well have taken into account the degree to which their dangers are known, the adverse consequences of prohibition, and the economic significance of their production. Whether such factors should lead to similar judgments concerning marijuana is within legislative discretion." *United States v. Maiden*, 355 F.Supp. 743, 747–48 (D.Conn.1973).

**37.** The penalties imposed for marijuana are compared to those Schedule I drugs recognized to be the most dangerous of the substances regulated by the CSA, *i. e.*, heroin and the other opiates, rather than those drugs in other schedules that arguably are closer to marijuana in terms of harmful effects. By so doing, and by concluding that NORML's equal protection challenge, viewed in this light, must fail, the plaintiff's argument regarding penalties is rejected even in its most persuasive form. A fortiori, the penalties for marijuana do not violate the equal protection guarantee when com-

tablishing the same penalty for all possessory offenses involving controlled substances, has chosen to concentrate on distribution and not possession of drugs. The CSA provides stiff penalties for sale or distribution according to the schedule classifications, while simple possessory offenses are misdemeanors. When deciding on penalties, Congress need not consider only the potential harm from a drug; it also may consider the magnitude of the social problem, the deterrent effect of a particular penalty, and any special regulatory problems involved with a penalty scheme. *See Gore v. United States*, 357 U.S. 386, 393, 78 S.Ct. 1280, 1284, 2 L.Ed.2d 1405 (1958). In determining penalties, the legal classification of a drug does not have to match its medical classification, *see United States v. Brookins*, 383 F.Supp. 1212, 1214–15 (D.N.J.1974) (different legal and medical classification of cocaine permitted), *aff'd mem.*, 524 F.2d 1404 (3d Cir. 1975), for Congress may consider other issues not involving a drug's medical properties. In addition, the penalties do not need to be graduated according to the potential harm of the drug. On this point, the Supreme Court has stated: "[T]he Due Process Clause of the Fourteenth Amendment does not, nor does anything in the Constitution, require a State to fix or impose any particular penalty for any crime it may define or to impose the same or 'proportionate' sentences for separate or independent crimes." *Williams v. Oklahoma*, 358 U.S. 576, 586, 79 S.Ct. 421, 427, 3 L.Ed.2d 516

(1959). *See also Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 60, 82 L.Ed. 43 (1937).

As noted above, lingering uncertainties about the effects of marijuana still exist, and Congress reasonably resolved these questions by penalizing its possession. Furthermore, Congress was aware of the differing views on marijuana control[38] when it classified the drug and set penalties for possession and distribution. Indeed, marijuana received special consideration: lower penalties were set for distribution of small amounts of the drug for no compensation. 21 U.S.C. § 841(b)(4). Congress nonetheless rejected attempts to provide lower penalties for marijuana possession, fearing that such action would create the impression that marijuana use was acceptable. *See* 116 Cong.Rec. 1653 (1970) (statement of Sen. Dodd). These actions all indicate that Congress rationally dealt with the problem of penalties and sentencing in passing the CSA; NORML's contention that the marijuana penalties are too severe must be rejected.

### 2) *Classification in Schedule I*

NORML argues that marijuana does not belong in Schedule I, for it does not satisfy that schedule's statutory criteria—high potential for abuse, no medically accepted use, and no safe use of the drug even under medical supervision. 21 U.S.C.

---

pared to the less harmful drugs that are controlled substances under the CSA.

**38.** Senator Hughes introduced an amendment to the Senate bill (S. 3246) to lower the penalty for possession of marijuana to six months from one year. He argued that this lower penalty reflected more closely the actual dangers of marijuana:

> For some, marihuana can be a dangerous drug. Generally, however, it is a mild drug, when compared with other hallucinogens such as LSD, or with certain amphetamines and barbiturates. To equate its risk—either to the individual or society—with the risks of hard drugs or with more dangerous drugs simply has no basis. . . . We must be consistent across the board. And so we must treat marihuana honestly, in proportion to its dangers as we see them.

116 Cong.Rec. 1648 (1970) (statement of Sen. Hughes). Senator Dodd, the sponsor of S. 3246, disagreed. He believed the problems raised by marijuana use were very real:

> [W]e cannot take the chance of treating this problem as something that is not really very serious. It is very serious, and it does very serious and harmful things to other people.
>
> I think that with the provision of this bill reducing the possession of marihuana down to a misdemeanor and taking away the mandatory requirement of the imposition, the penalty, that we are going as far as we should go.

*Id.* at 1653 (statement of Sen. Dodd). Senator Dodd's view prevailed, and the amendment was rejected.

§ 812(b)(1) (1976). The Government disagrees and contends that all three criteria are met. It claims the drug has a "high potential for abuse," *see* 1970 House Report, *supra* at 34–35, *reprinted in* [1970] U.S.Code Cong. & Admin.News at pp. 4601–02, in that millions of Americans use marijuana on their own initiative rather than on the basis of medical advice. While tests have indicated that marijuana may have therapeutic uses in the treatment of glaucoma and cancer, 1976 HEW Report, *supra* at 25, the Food and Drug Administration does not currently accept it for any form of medical treatment. *See* 44 Fed.Reg. 36123, 36126 (1979). Finally, the Government claims that marijuana cannot be used safely due to the differing concentrations of THC in cannabis. *Id.*; *see* page 128 *supra.*

Even assuming, arguendo, that marijuana does not fall within a literal reading of Schedule I, the classification still is rational.[39] Placing marijuana in Schedule I furthered the regulatory purposes of Congress. The statutory criteria of section 812(b)(1) are guides in determining the schedule to which a drug belongs, but they are not dispositive. Indeed, the classifications at times cannot be followed consistently, and some conflict exists as to the main factor in classifying a drug—potential for abuse or possible medical use.[40] The district court in *United States v. Maiden*, 355 F.Supp. 743 (D.Conn.1973), discussed this problem in rejecting the identical claim raised here by NORML:

> [The statutory classifications] cannot logically be read as cumulative in all situations. For example finding (B) for Schedule I requires that "The drug or other substance has no currently accepted medical use in treatment in the United States." Finding (B) for the other four schedules specifies that the drug has a currently accepted medical use. At the same time, finding (A) requires that the drug has a "high potential for abuse" for placement in Schedule I, but a "potential for abuse less than the drugs or other substances in Schedules I and II" for placement in Schedule III. If the findings are really cumulative, where would one place a drug that has no accepted medical use but also has a potential for abuse less than the drugs in Schedules I and II? According to finding (A) for Schedule III it belongs in Schedule III, but finding (B) for that schedule precludes Schedule III; according to finding (B) for Schedule I it belongs in Schedule I, but finding (A) for that schedule appears to preclude Schedule I.

*Id.* at 749 n. 4.

The legislative history also indicates the statutory criteria are not intended to be exclusive. The House report states that "[a]side from the criterion of actual or relative potential for abuse, subsection (c) of section 201 [21 U.S.C. § 811(c)] lists seven other criteria . . . which must be considered in determining whether a substance meets the specific requirements specified in section 202(b) [21 U.S.C. § 812(b)] for inclusion in particular schedules . . . ." 1970 House Report, *supra* at 35, *reprinted in* [1970] U.S.Code Cong. & Admin.News at

---

**39.** *See United States v. Maiden*, 355 F.Supp. 743 (D.Conn.1973).

**40.** According to the House Report, "[a] key criterion for controlling a substance, and the one which will be used most often, is the substance's potential for abuse." 1970 House Report, *supra* note 4, at 34, *reprinted in* [1970] U.S.Code Cong. & Admin.News at p. 4601. Senator Hughes, on the other hand, believed the existence of an accepted medical use was the primary factor in a drug's classification. Discussing the penalties for possession of marijuana and heroin, he noted:

> Classification in the bill depends primarily upon whether there is an accepted medical use for the drug. Because heroin and marijuana have no recognized medical use, they are classified in the same category. . . . If there is no valid use for a drug, there is a sound reason to impose the strictest record-keeping controls. But criminal sanctions for illegal distribution and use should be based upon the danger to society and the individual, not upon whether there is any valid medical use.

116 Cong.Rec. 36882 (1970). Other members of Congress indicated the two criteria were equally important. "The categorizations are based on [the] 'drug's potential for abuse and nonmedical use.'" 116 Cong.Rec. 33658 (1970) (statement of Rep. Cohelan).

4602. The criteria listed in section 811(c)[41] include the state of current knowledge, the current pattern of abuse, the risk to public health, and the significance of abuse. These more subjective factors significantly broaden the scope of issues to be considered in classifying a drug. Given these other concerns, Congress might well want marijuana in Schedule I for regulatory purposes. Such a classification carries heavier penalties for sale, distribution, and importation, thus aiding law enforcement officials in their effort to reduce the supply of marijuana.

In addition, Congress itself made the initial classifications, 21 U.S.C. § 812(c), and established a procedure for reclassifying drugs and controlled substances: "Schedules I, II, III, IV, and V shall, *unless and until amended pursuant to section 811 of this title* [21 U.S.C. § 811], consist of the following drugs and other substances . . . ." 21 U.S.C. § 812(c) (emphasis added). In making the initial determination, Congress placed marijuana in Schedule I. The clear meaning of section 812(c) is that Congress intended marijuana to remain in Schedule I until such time as it might be reclassified by the Attorney General on the basis of more complete scientific information about the drug. In such a re-

classification hearing, the statutory criteria would be the guides to determining the most appropriate schedule for marijuana. By providing for periodic review and constant revision of drug classifications, Congress enacted a sensible mechanism for scrutinizing the classification of marijuana. As Judge Feinberg stated in *United States v. Kiffer*:

> [T]he very existence of the statutory scheme indicates that, in dealing with the "drug" problem, Congress intended flexibility and receptivity to the latest scientific information to be the hallmarks of its approach. This . . . is the very antithesis of the irrationality [plaintiff] attributes to Congress.

477 F.2d 349 at 357.

The legislative scheme under section 811 offers a flexible means of reclassifying controlled substances, and the Attorney General may reclassify marijuana pursuant to that scheme.[42] The propriety of any administrative determination on the reclassification of marijuana is not before this court.[43] The constitutional legitimacy of the classification of marijuana in Schedule I is challenged, however, and this court concludes that the classification is constitutionally permissible. Thus, plaintiff's equal protection challenge must be rejected.[44]

**41.** This section states: ·

> In making any finding under subsection (a) of this section or under subsection (b) of section 202 [21 U.S.C. § 812(b)], the Attorney General shall consider the following factors with respect to each drug or other substance proposed to be controlled or removed from the schedules:
> (1) Its actual or relative potential for abuse.
> (2) Scientific evidence of its pharmacological effect, if known.
> (3) The state of current scientific knowledge regarding the drug or other substance.
> (4) Its history and current pattern of abuse.
> (5) The scope, duration, and significance of abuse.
> (6) What, if any, risk there is to the public health.
> (7) Its psychic or physiological dependence liability.
> (8) Whether the substance is an immediate precursor of a substance already controlled under this title.

21 U.S.C. § 811(c) (1976).

**42.** For a history of NORML's attempts to reclassify marijuana through administrative proceedings, see note 3 *supra.*

**43.** Indeed, this three-judge district court lacks jurisdiction to hear a challenge to an administrative reclassification proceeding. Judicial review of the Attorney General's failure to reclassify a controlled substance pursuant to 21 U.S.C. § 811(a) is limited to the United States Court of Appeals for the District of Columbia or for the circuit in which petitioner's place of business is located. 21 U.S.C. § 877 (1976). Plaintiff has pursued this statutory scheme, and its challenge to the Attorney General's failure to reclassify marijuana is currently pending in the District of Columbia Circuit. *See NORML v. DEA*, No. 79–1660 (D.C.Cir., filed June 27, 1979).

**44.** NORML also suggests that the marijuana provisions of the CSA are racially discriminatory because they are most often applied against blacks. This claim is meritless. Congress passed the CSA to promote the public health

### c. Cruel and Unusual Punishment

Finally, NORML argues that the penalties under the CSA for marijuana possession violate the eighth amendment's ban on cruel and unusual punishment. The plaintiff contends that a one-year sentence and $5,000 fine are so disproportionate to the nature of the offense that they must be overturned. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); *Weems v. United States*, 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910).[45] This argument must be rejected.

▮ The Supreme Court has established a framework for examining challenges to the severity of a criminal statute. *See Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977) (plurality opinion of White, J.); *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (plurality opinion of Stewart, J.); *Robinson v. California; Weems v. United States.* A court must compare the severity of the offense being punished and its sentence with the punishment imposed for other crimes in the jurisdiction and for the same crime in other jurisdictions. In evaluating these factors, a court must consider "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 596 (1958) (plurality opinion). "Furthermore, these Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual [judges]; judgment should be informed by objective factors to the maximum possible extent." *Coker v. Georgia*, 433 U.S. at 592, 97 S.Ct. at 2866. This objective analysis is designed to prevent unwarranted judicial interference with legislative prerogatives. As Justice Stewart stated in *Gregg*:

> [I]n assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.
>
> This is true in part because the constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards. "[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." . . . Caution is necessary lest this Court become, "under the aegis of the Cruel and Unusual Punishment Clause, the ultimate arbiter of the standards of criminal responsibility . . . throughout the country."

*Gregg v. Georgia*, 428 U.S. at 175–76, 96 S.Ct. at 2926 (plurality opinion) (citations omitted).

▮ Judged by these standards, the penalties for possession of marijuana do not violate the eighth amendment. Private possession is not a major offense under the CSA; a first offense is only a misdemeanor. The penalty of one year is not excessive compared to other possessory federal crimes,[46] and the penalty falls within the middle of various state penalties for possession.[47] In addition, judges are given discre-

---

and welfare, and there is no discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

**45.** NORML relies on Justice Stewart's dictum in *Robinson v. California* that "[e]ven one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." 370 U.S. at 667, 82 S.Ct. at 1421. *Robinson* involved a ninety day sentence for a crime penalizing the "status" of being a narcotics addict. Possession of marijuana is not a "sta-

tus" crime, and *Robinson* is therefore inapposite.

**46.** *See, e. g.*, 18 U.S.C. § 1156 (1976) (maximum penalty of one year imprisonment and $500 fine for unlawful possession of intoxicants on Indian land).

**47.** Some states now have fines for possession of marijuana, while others have penalties for a first offense ranging from six months to six years. These higher penalties are associated

tion under the CSA to suspend a sentence or to give a year's probation. These penalties cannot be deemed cruel and unusual.

## V. Final Considerations

In this case, NORML has asked this court to overturn the CSA prohibition on private possession of marijuana. In so doing, NORML misdirects its efforts. This challenge presents the difficult social questions that legislatures are especially adept at resolving, and we do not sit to second-guess their judgments.[48] Under our system of checks and balances, it is the court's duty to examine legislation and to determine the legality or illegality of that legislation within the confines of the law. It is the responsibility of the court "to construe and enforce the Constitution and laws of the land as they are and not to legislate social policy on the basis of . . . personal inclinations" or other nonlegal considerations. *Evans v. Abney*, 396 U.S. 435, 447, 90 S.Ct. 628, 635, 24 L.Ed.2d 634 (1970). *See also New Orleans v. Duke*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976); *Marshall v. United States*, 414 U.S. 417, 427, 94 S.Ct. 700, 706, 38 L.Ed.2d 618 (1974). The legislative system may not always work efficiently, or fairly, but we have staked our fortunes on it, and our history would support the wisdom of our forefathers'

judgment. As Justice Frankfurter once noted:

> [T]here is not under our Constitution a judicial remedy for every political mischief, for every undesirable exercise of legislative power. . . . Appeal must be to an informed civically militant electorate. In a democratic society like ours, relief must come through an aroused popular conscience that sears the conscience of the people's representatives.

*Baker v. Carr*, 369 U.S. 186, 270, 82 S.Ct. 691, 739, 7 L.Ed.2d 663 (1962) (Frankfurter, J., dissenting).

NORML's efforts have seared the conscience of many representatives. Eleven states have decriminalized possession of marijuana,[49] and efforts to decriminalize are continuing in many others. The legislative branch, and not the judicial, is the proper battleground for the fight to decriminalize the possession of marijuana. The people, and not the courts, must decide whether the battle will be won or lost.

---

with possession of large amounts of the drug. *See* National Governors' Conference, Center for Policy Research and Analysis, Marijuana: A Study of State Policies & Penalties, Table IV–4 at 99–104 (1977) (listing state penalties for sale and possession of marijuana).

**48.** In testifying before Congress, Doctor Lester Grinspoon argued that the remaining questions about marijuana should not stop policymakers from reaching decisions about the drug:

> Rigorously impartial scientific investigation is important to counteract the prejudice and irrationality that have characterized much of the debate about marihuana, but this impartiality should not be allowed to degenerate into a false objectivity that declares it unscientific to make policy recommendations. We must take the scientific conclusions where they lead us as citizens, and stop the increasingly unjustifiable prosecution of marihuana users.

Select Comm. on Narcotics Abuse and Control, 95th Cong., 1st Sess., Considerations For and Against the Reduction of Federal Penalties For Possession of Small Amounts of Marihuana For Personal Use 7 (Comm. Print 1977). Dr. Grinspoon, of course, is correct. Responsibility for these decisions, however, rests with Congress, and it has made its choice in enacting the CSA.

**49.** *See, e. g.*, Alaska Stat. § 17.12.110 (1975) (civil offense); Cal. Health & Safety Code §§ 11357, 11361.5 (West Supp. 1979) (misdemeanor—no permanent criminal record); Colo. Rev.Stat. § 12–22–412(12) (1978 Repl. Vol.) (Class 2 petty offense—no criminal record); Minn.Stat.Ann. 152.15(1)–(5), .15(2)–(5) (West Supp. 1979) (petty misdemeanor); N.Y.Penal Law 221.05 (McKinney Supp. 1978) (violation —no criminal record); N.C.Gen.Stat. § 90–94, –95(d)(4) (Michie 1979 Cum.Supp.) (minor misdemeanor); Ohio Rev.Code Ann. § 2925.-11(C)(3), .11(D) (Page 1978 Cum.Supp.) (minor misdemeanor—no criminal record); Or.Rev. Stat. § 167.207(3) (1975) (civil offense).