**UNITED STATES of America, Plaintiff,**

v.

**Jean Marie SUQUET, et al., Defendants.**

**No. 80 CR 718.**

United States District Court,
N.D. Illinois, E.D.

July 20, 1982.

John Sullivan, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

William H. Theis, Chicago, Ill., for defendant Bounos.

James M. Shellow, Milwaukee, Wis., Frank W. Oliver, Northfield, Ill., for defendant Browning.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

The facts underlying this case have been set forth at length in my previous decisions rejecting defendants' claims of wiretap abuse and double jeopardy violation. *See United States v. Suquet,* 547 F.Supp. 1034 (N.D.Ill.1982) (wiretap); *United States v. Suquet,* No. 80 CR 718 (N.D.Ill. August 23, 1982), *affd. sub nom. United States v. Bounos,* 693 F.2d 38 (7th Cir.1982) (double jeopardy). Knowledge of these facts will for the most part be presumed.

This memorandum opinion seeks to explain why the court previously denied various defense motions. Two of these motions ask for dismissal of the entire indictment. Two others request dismissal of particular counts.

### Prosecutorial Vindictiveness

Defendant Michael Bounos seeks dismissal of the indictment on grounds of prosecutorial vindictiveness. He alleges he was indicted in September 1980 in case number 80 CR 490 on charges of participating in a 1980 cocaine conspiracy. The case was assigned to Judge Nicholas J. Bua of the Northern District of Illinois. Bounos "filed numerous pre-trial motions, some of them granted by Judge Bua. It was clear that the defendant intended to go to trial in 80 CR 490." [1]

In December 1980 the present 71 count indictment was handed down. It deals with a 1978–79 cocaine conspiracy and subjects Bounos to the possibility of "extra decades of punishment" over and above that which was already threatened by the indictment in 80 CR 490. Therefore, Bounos charges, it must be presumed that the present indictment was sought solely to induce Bounos to plead guilty in 80 CR 490, *i.e.,* to retaliate "against a defendant who insist[ed] upon his constitutional right to be proven guilty beyond a reasonable doubt." (Quotations from defendant's brief). Such vindictiveness, Bounos concludes, is impermissible under the Due Process clause of the Fifth Amendment.

What is most striking about this argument is that Bounos has brought forth no evidence of "actual" vindictiveness. He can therefore prevail "only if a *presumption* of vindictiveness—applicable in all cases—is warranted." *United States v. Goodwin,* — U.S. —, —, 102 S.Ct. 2485, 2493, 73 L.Ed.2d 74 (1982) (emphasis in original). It is not. "*Bordenkircher* [*v. Hayes,* 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978)] made clear that the mere fact that a defendant refuses to plead guilty and forces the Government to prove its case is insufficient to warrant a presumption that subsequent changes in the charging decision are unjustified." *United States v. Goodwin, supra,* 102 S.Ct. at 2494. The filing of pre-trial motions is routine and expected in criminal cases; it is therefore "unrealistic to assume that a prosecutor's probable response to such motions is to seek to penalize and to deter." *Id.* at 2493.

### The Proper Statutory Classification of Cocaine

Defendant John Browning urges dismissal of the indictment on the theory that the statutes relied upon by the Government are defective. Browning asserts that the Controlled Substances Act ("the Act") embodies an unconstitutional delegation of legislative power. He further charges that cocaine cannot rationally remain classified as a Schedule II substance, given the current state of scientific knowledge. I will discuss each of these contentions in turn.

The Act criminalizes various forms of conduct involving "controlled substances." 21 U.S.C. §§ 841–48. Controlled substances are subdivided into five schedules, each pertaining to a different category of drug. *Id.* at § 812. The penalties imposed by sections 841–48 vary according to the schedule of the drug involved.

---

1. Bounos has since been tried, convicted and sentenced by Judge Bua.

Section 812(c) lists the drugs that were deemed to fall within each schedule at the time of the Act's enactment in 1970. Congress recognized, however, that evolving medical and social knowledge might render its initial judgments obsolete. Therefore, to create an updating mechanism, Congress delegated to the Attorney General the following authority:

The Attorney General shall apply the provisions of this subchapter to the controlled substances listed in the schedules established by section 812 of the title and to any other drug or other substance added to such schedules under this subchapter. Except as provided in subsections (d) and (e) of this section, the Attorney General may by rule—

(1) add to such a schedule or transfer between such schedules any drug or other substance if he—

(A) finds that such drug or other substance has a potential for abuse, and

(B) makes with respect to such drug or other substance the findings prescribed by subsection (b) of section 812 of this title for the schedule in which such drug is to be placed; or

(2) remove any drug or other substance from the schedules if he finds that the drug or other substance does not meet the requirements for inclusion in any schedule.

Rules of the Attorney General under this subsection shall be made on the record after opportunity for a hearing pursuant to the rule-making procedures prescribed by subchapter II of chapter 5 of Title 5. Proceedings for the issuance, amendment, or repeal of such rules may be initiated by the Attorney General (1) on his own motion, (2) at the request of the Secretary [of Health and Human Services], or (3) on the petition of any interested party.

*Id.* at § 811(a). The Attorney General has sub-delegated his authority under section 811(a) to the Administrator of the Drug Enforcement Agency ("the Administrator"). 28 C.F.R. § 0.100.

Because of the interrelationship between section 811, on the one hand, and sections 841–48, on the other, the Administrator can in effect declare certain conduct criminal. When the Administrator rules, for example, that a newly-discovered substance should be controlled, dealings in that substance automatically become forbidden.

■■■ It is well established, however, that Congress can delegate to an administrative official the task of "filling in the details" of a criminal statute. In *United States v. Grimaud,* 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911), the Supreme Court upheld a conviction for violating a regulation promulgated by the Secretary of Agriculture. The Court noted that the Forest Reserve Act of 1891—the statute conferring the Secretary's authority—expressly stated that "any violation of ... such rules and regulations shall be punished." Thus, in the Court's view, Congress had retained its sovereign power over the federal criminal code:

A violation of reasonable rules regulating the use and occupancy of the property is made a crime, not by the Secretary, but by Congress. The statute, not the Secretary, fixes the penalty.

*Id.* at 522, 31 S.Ct. at 485. Similarly, here, Congress determined that certain dealings in controlled substances would be criminal. There was nothing per se improper in Congress' granting the executive branch the power to determine exactly which chemicals satisfy the statutory requirements for control.

Browning has made basically three attempts to distinguish *Grimaud,* none of which is persuasive. First, he claims that *Grimaud* legitimates delegations only when they are made to implement "a valid federal regulatory function." How he could possibly think that this requirement is not satisfied here is completely baffling. Second, he argues that *Grimaud* does not justify a delegation under which the executive determines not only which particular transactions are criminal, but also the penalties to be imposed. As a matter of abstract law, Browning may well have a point. Grave

constitutional questions would be present if Congress had legislated the following law:

> Distribution of any substance determined by the Administrator to meet the requirements for control established herein shall be illegal. The penalty for such distribution shall be as the Administrator provides by rule.

See Gelhorn, *Administrative Prescription and Imposition of Penalties,* 1970 Wash.U. L.Q. 265, 268–71; *see also United States v. Batchelder,* 442 U.S. 114, 125–26, 99 S.Ct. 2198, 2204–05, 60 L.Ed.2d 755 (1979). The Controlled Substances Act, however, is quite clearly of a different mold. Congress did not grant the Administrator the power to determine which penalties should be imposed upon which sorts of generic violations (*e.g.,* possession with intent to distribute a Schedule II substance). Congress itself made these determinations. The Administrator was authorized to do nothing more than determine which substances belong within which Schedule. This is entirely permissible under *Grimaud.*

Browning's rejoinder seems to be that because the Administrator can pick from among five schedules, and because the statutory penalties vary by Schedule, the Administrator has in reality a great deal of control over the punishment levied on a given transaction. This claim fails for at least two reasons. First, the Administrator cannot list a substance under whichever schedule he desires. In sections 812(b)(1)–(5) Congress set forth detailed criteria substantially curtailing the Administrator's discretion. *See infra.* Moreover, whatever discretion the Administrator retains is inevitable in a *Grimaud* situation. In *Grimaud,* it was within the Secretary's discretion to forbid sheep grazing on the Sierra Forest Reserve without a permit. Presumably, at this level of detail, it was also within the Secretary's authority to hold to the contrary. The Secretary therefore had the implicit power to pick the punishment—either nothing or whatever the Forest Reserve Act provided—associated with such grazing. Similarly here, to the extent that a given substance arguably fits within either of two schedules, the Administrator possesses the de facto power to choose from between two punishments. If the Forest Reserve Act passed muster, so must the Controlled Substances Act.

The only ground on which the two situations can be distinguished is that the Controlled Substances Act may under some circumstances allot the Administrator more options than the Secretary possessed under the Forest Reserve Act. The latter official apparently had only two ways to deal with unrestricted grazing—he could mandate either no punishment or the statute's one quantum of penalty. The Administrator, by contrast, could have more than two choices—if, for example, the drug in question arguably fit within three or more schedules. On its face, such expanded discretion is unobjectionable. The Constitution should not be read to enact a rigid ceiling of only two choices. "Expanded discretion" is, however, a symptom of a more serious potential problem. It may indicate that the criteria limiting the Administrator's discretion are so toothless that they are in fact no constraint at all.

■ This is the gist of Browning's final argument. He contends that even if it is permissible in general for the Administrator to schedule and reschedule drugs, the statute as written is nevertheless void because it allots the Administrator an excessive amount discretion in carrying out this task. It is clear that this argument "states a claim." The Controlled Substances Act cannot be upheld simply because it passes the basic *Grimaud* test.[2] To be legitimate, the Act must also narrow the range of choice that the Executive possesses in enacting his rules. *United States v. Davis,* 564 F.2d 840, 844 (9th Cir.1977), *cert. denied,* 434 U.S. 1015, 98 S.Ct. 733, 54 L.Ed.2d 760 (1978); *United States v. Piatti,* 416 F.Supp. 1202, 1205 (E.D.N.Y.1976); *see generally Schecter Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935).

**2.** *I.e.,* Congress must decide that violations of the Executive's orders are criminal.

Browning is not the first to challenge the statute on these general grounds, yet his claim differs in significant particulars from those made before. Defendants in all previous cases have attacked the statute for allegedly granting the Administrator a de facto ability to classify each drug in whichever schedule he so desired. The courts, noting the detailed criteria contained in sections 811(b), (c) and 812(b), have uniformly and correctly rejected this claim. *United States v. Erwin,* 602 F.2d 1183, 1185 (5th Cir.1979), *cert. denied,* 444 U.S. 1071, 100 S.Ct. 1014, 62 L.Ed.2d 752 (1980); *United States v. Barron,* 594 F.2d 1345, 1351–53 (10th Cir.), *cert. denied,* 441 U.S. 951, 99 S.Ct. 2180, 60 L.Ed.2d 1056 (1979); *United States v. Gordon,* 580 F.2d 827, 837–40 (5th Cir.), *cert. denied,* 439 U.S. 1051, 1079, 99 S.Ct. 731, 1079, 58 L.Ed.2d 711, 59 L.Ed.2d 49 (1978); *United States v. Roya,* 574 F.2d 386, 392 (7th Cir.), *cert. denied,* 439 U.S. 857, 99 S.Ct. 172, 58 L.Ed.2d 165 (1978); *United States v. Davis, supra,* 564 F.2d at 844; *United States v. Pastor,* 557 F.2d 930, 939–41 (2d Cir.1977); *United States v. Piatti, supra,* 416 F.Supp. at 1205–06; *cf. State v. Peloquin,* 427 A.2d 1327 (R.I.1981), and cases cited therein (rejecting similar attack on analogous state statute). *But cf. Nat. Org. for Reform of Marijuana Laws v. Bell,* 488 F.Supp. 123, 140 (D.D.C.1980) (three judge court) ("The statutory criteria of section 812(b)(1) are guides in determining the schedule to which a drug belongs, but they are not dispositive. Indeed, the classifications at times cannot be followed consistently. . . .") The *Roya* Court remarked that the argument "borders on the frivolous." 574 F.2d at 392.

Browning thus concedes, as he must, that the standards guiding the reclassification process, once it has started, are sufficient. He alleges, though, that the statute offers absolutely no guidance as to when the Administrator should begin the procedure in the first place. The scenario Browning attempts to conjure is of the Administrator "sitting" on a mountain of data exonerating cocaine. Since the Administrator is allegedly under no obligation to initiate a rulemaking proceeding under even these circumstances, he could thus thwart Congress' will by extending the Act's criminal prohibitions beyond their useful life. The Administrator, not Congress, would be the ultimate social arbiter.

Browning is plainly wrong. The statute is not silent as to when rulemaking should or should not begin. Section 811(b) provides that "upon gathering the necessary data," the Administrator "shall . . . request from the Secretary [of Health and Human Services] a scientific and medical evaluation, and his recommendations, as to whether such drug or other substance should be so controlled or removed as a controlled substance." The legislative history underlying this provision indicates that the "necessary data" has been gathered when the Administrator "has reason to believe that there may be ground for controlling or decontrolling a drug or other substance." H.R. 91–1444, 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Admin.News 4566, 4600.

The Administrator is bound by whatever "scientific and medical" findings the Secretary makes. 21 U.S.C. § 811(b). The Administrator "shall initiate" section 811(a) rulemaking proceedings if he "determines that these facts and all other relevant data constitute substantial evidence of potential for abuses such as to warrant control or substantial evidence that the drug or other substance should be removed entirely from the schedules." *Id.*

The statute thus creates two trigger points that must be satisfied before rulemaking begins. The Administrator must determine first that referral to the Secretary is appropriate and, second, that the Secretary's findings (in combination with "all other relevant data") justify further proceedings. Moreover, these decisions must be made with reference to the concededly valid standards that determine if control is appropriate and in what degree.[3]

---

**3.** The only difference between the two decision-making structures lies in the certainty with

which the Administrator must believe that the schedules should be altered. Referral must be

Browning's delegation argument has no merit.[4]

■ His challenge to the current classification of cocaine similarly fails. Most basically, it is irrelevant whether the *current* state of medical knowledge supports Schedule II classification. The relevant time frame for analysis is the period during which the alleged offenses were committed. "Reclassification ... subsequent to the date of the alleged offense would, in no way, relieve defendant of the criminal responsibility for his acts." *United States v. Creswell,* 515 F.Supp. 1268, 1271 (E.D.N.Y. 1981); *see also United States v. Jones,* 480 F.2d 954, 960 (5th Cir.), *cert. denied,* 414 U.S. 1071, 94 S.Ct. 582, 38 L.Ed.2d 476 (1973); *cf. United States v. Nocar,* 497 F.2d 719 (7th Cir.), *cert. denied,* 419 U.S. 1038, 95 S.Ct. 526, 42 L.Ed.2d 315 (1974) (Court looked to the date of violation when measuring the Government's compliance with the republication provisions of 21 U.S.C. § 812(a)).[5]

■ Moreover, even if amended to challenge the propriety of cocaine's classification during the correct time period, Browning's motion would still merit dismissal without a hearing. Two district courts have ruled that reclassification defenses of this nature are barred by the doctrine of exhaustion of remedies: "The proper method to argue for reclassification of cocaine is through a petition to the Attorney General [to initiate a § 811(a) rulemaking proceeding; *see* note 4, *supra* ]." *United States v. Gaertner,* 519 F.Supp. 585, 594 (E.D.Wis.

1981); *accord, United States v. LaFroscia,* 354 F.Supp. 1338, 1341 (S.D.N.Y.1973); *cf. United States v. Stieren,* 608 F.2d 1135, 1137 (8th Cir.1979) ("If cocaine is to be reclassified, defendant's argument should be made to the legislative branch, not the courts.") Under this view, an individual cannot knowingly trade in controlled substances and only later claim that his activities are legitimate. He must first change the law, not break it.

I find the rationale of these decisions compelling, though I recognize that the Supreme Court has cautioned against indiscriminate use of the exhaustion doctrine in the criminal context:

First of all, it is well to remember that use of the exhaustion doctrine can be exceedingly harsh. The defendant is often stripped of his only defense; he must go to jail without having any judicial review of an assertedly invalid order.

*McKart v. United States,* 395 U.S. 185, 197, 89 S.Ct. 1657, 1664, 23 L.Ed.2d 194 (1969). Despite this language, the Court refused only two years later to consider an accused draft violator's claim that his local draft board had improperly denied him an exemption. *McGee v. United States,* 402 U.S. 479, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971). The Court held that the defendant should have pursued administrative appeals before refusing to report for induction. His failure to do so was fatal.

Central to the Court's holding was its recognition that "McGee's claims to exempt status—as a ministerial student or a conscientious objector—depended on the applica-

---

made even if the Administrator has only "reason to believe" that a change is needed. Rulemaking, by contrast, need not follow unless "substantial evidence" mandates alteration.

4. Moreover, the public need not wait for the Administrator to take note of new scientific developments. "Any interested party" can petition the Administrator to initiate rulemaking (*i.e.,* to refer the petition to the Secretary for findings). 21 U.S.C. § 811(a); *see generally* 44 Fed.Reg. 36123 (1979) (noting that the Administrator had referred to the Secretary a petition to initiate rulemaking submitted by the National Organization for the Reform of Marijuana Laws). The public's ability to jolt the Adminis-

trator into action clearly restricts the amount of discretion granted by the statute.

5. Browning also claims in portions of his brief that the classification was improper as of the date the indictment was returned. The same objections apply to this allegation.

Browning has explicitly conceded that cocaine was properly scheduled by Congress when the *Controlled Substances Act was* enacted in 1970. The contrary position has been consistently rejected. *See, e.g., United States v. Castro,* 401 F.Supp. 120 (N.D.Ill.1975). Browning's motion is based on the theory that new evidence has rendered Congress' initial judgment obsolete.

tion of expertise by administrative bodies in resolving underlying issues of fact." *Id.* at 486, 91 S.Ct. at 1569. The Court distinguished *McKart,* also a draft violation case, on the ground that "[t]he validity of [McKart's] claim [for exemption] was a question 'solely ... of statutory interpretation.' [*McKart, supra,* 395 U.S. at 197–98, 89 S.Ct. at 1664–65].... The issue was not one of fact and thus its resolution would not have been aided by the exercise of special administrative expertise." *McGee, supra,* 402 U.S. at 485, 91 S.Ct. at 1569. As a general rule, the Court has thus adopted a functional approach to the exhaustion question. Claims should be exhausted when their resolution "require[s] the application of expertise or the exercise of discretion." *McKart, supra,* 395 U.S. at 198 n. 16, 89 S.Ct. at 1665 n. 16; *id.* at 200, 89 S.Ct. at 1666. "[T]he interest in full airing of the facts within the administrative system" is also "prominent" when the application of such expertise and discretion first necessitates a "careful gathering and analysis of relevant facts." *McGee, supra,* 402 U.S. at 490, 91 S.Ct. at 1571.

These principles clearly support the imposition of an exhaustion requirement in this case. To resolve Browning's argument, this court would first have to gather and then analyze a myriad of technical facts. But, at least initially, the proper bodies to conduct such a difficult and wide-ranging inquiry are the Drug Enforcement Agency and the Department of Health and Human Services, not the federal district courts. *United States v. LaFroscia, supra,* 354 F.Supp. at 1341; *see generally United States v. Castro,* 401 F.Supp. 120, 127 (N.D.Ill.1975); *United States v. DiLaura,* 394 F.Supp. 770, 773 (D.Mass.1974). As the Second Circuit noted, "[t]he question whether a substance belongs in one schedule rather than another clearly calls for fine distinctions, but the statutory procedure at least offers the means for producing a thorough factual record upon which to base an informed judgment." *United States v. Kiffer,* 477 F.2d 349, 357 (2d Cir.), *cert. denied,* 414 U.S. 831, 94 S.Ct. 165, 38 L.Ed.2d 65 (1973).

The *Kiffer* Court nevertheless rejected the implications of its observation and reached the merits of Kiffer's classification defense. The Court gave two reasons for rejecting the Government's exhaustion argument. It first held that the section 811(a) petition mechanism offered "at best ... an uncertain and indefinitely delayed remedy." *Id.* at 351–52. This conclusion derived from the observation that the Director of the Bureau of Narcotics and Dangerous Drugs—the Administrator's predecessor—had previously taken the position that international treaty obligations prohibited the rescheduling of marihuana, the drug at issue in *Kiffer.*[6] Second, the Court cited *McKart* for the proposition that exhaustion "is generally not favored" in criminal cases.[7]

---

**6.** The Director had previously refused to accept a rescheduling petition submitted by the National Organization for the Reform of Marijuana Laws. *See* 37 Fed.Reg. 18097 (1972). The Court of Appeals for the District of Columbia reversed and remanded for further proceedings. *National Organization for the Reform of Marijuana Laws v. Ingersoll,* 497 F.2d 654 (D.C.Cir. 1974); *see also National Organization for the Reform of Marijuana Laws v. Bell,* 488 F.Supp. 123, 125 n. 3 (D.D.C.1980) (three judge court) (updating this litigation).

The Director had relied upon 21 U.S.C. § 811(d)(1) in justifying his initial rejection of the petition. This provision states:

If control is required by United States obligations under international treaties, conventions, or protocols in effect on October 27, 1970, the Attorney General shall issue an order controlling such drug under the sched-

ule he deems most appropriate to carry out such obligations, without regard to the findings required by subsection (a) of this section or section 812(b) of the title and without regard to the procedures prescribed by subsections (a) and (b) of this section.

In this court, the Government has similarly argued that the United States' obligations under the Single Convention on Narcotic Drugs, 18 U.S.T. 1407, preclude removing cocaine from Schedule II. *See* 46 Fed.Reg. 9267 (1981). In light of my other conclusions, this contention need not be reached.

**7.** The defendants in *Kiffer* argued that Congress' placement of marijuana in Schedule I was so arbitrary it was unconstitutional. They further asserted that principles of exhaustion did not obstruct this challenge since the Director lacked the authority to declare *the Act*

The latter statement is surely true, but *McGee* reaffirms that exhaustion can be invoked, under appropriate circumstances, even when its effect is to short-circuit a potentially meritorious defense to a criminal charge. *Accord, Yakus v. United States,* 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944); *see also Poulos v. State of New Hampshire,* 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953). The *Kiffer* Court's criticism of the "effectiveness" of the section 811(a) petition procedure is also unpersuasive. The statement cited by the Court concerning the United States' treaty obligations toward marijuana was issued well after the allegedly criminal conduct had transpired. The evidence marshalled by the Court thus failed to show that the procedure contemplated by section 811(a) was "uncertain" and "delayed" at the time the criminal enterprise began, the relevant moment for assessing the remedy's value.[8]

Moreover, even if the Director's statement had been made prior to the challenged conduct, it remains unclear why its existence would have justified the defendants' failure to follow the statutory procedure outlined in section 811(a). Of course, had the defendants petitioned the Director under such circumstances, they would have most likely faced the prospect of litigating the treaty issue twice—once before the Director and then again on appeal in the courts.[9] Conversely, by sidestepping the petition route, the defendants made sure that the initial round of argument never occurred. The *Kiffer* Court's criticism of section 811(a) may thus have been rooted in a belief that the statutory remedy was inadequate for the purpose of expeditiously resolving the treaty question. But if so, the Court failed to explain why this concern mattered. The defendants in *Kiffer,* like the defendants in this case, proposed only to engage in the commercial distribution of controlled substances. The cost of delaying, or even deterring, such behavior is surely slight[10] compared to the cost in lost expertise that a contrary no-exhaustion rule exacts. Thus, even if the procedure contemplated by section 811(a) is "inadequate" on the grounds discussed above, Browning's failure to utilize this mechanism cannot be excused. His suggestion that this court play the role assigned by Congress to the executive branch must be denied.[11]

unconstitutional. The Court "put to one side" the latter contention:

> Whatever weight such an argument might have in the usual case, timely and successful use of this administrative remedy would have obtained for appellants the very relief they seek from us—a declaration either that marihuana should not be subject to the Act or that it should be covered only in another schedule carrying lesser penalties.

*Kiffer, supra,* 477 F.2d at 351. To the extent that Browning similarly believes that the failure to reclassify cocaine is of constitutional dimension, the *Kiffer* response follows *a fortiori.* On this phase of his argument, Browning's complaint is not that Congress has hurt him, but that the Administrator has. *See* note 5, *supra.* Since the Administrator clearly has the power to correct *his own* errors, there can be no merit to the idea that the administrative process was unable in this case to deliver the desired relief. *Compare Moore v. City of East Cleveland,* 431 U.S. 494, 497 n. 5, 97 S.Ct. 1932, 1934 n. 5, 52 L.Ed.2d 531 (1977) (plurality opinion) (defendant can challenge the *facial constitutionality* of a statute under which he is prosecuted without first exhausting available administrative exemption procedures); *id.* at 541, 97 S.Ct. at 1957 (Stewart, J., dissenting) (same).

8. This is the time when the defendants would have utilized the remedy, had they been so inclined.

9. The Act provides for judicial review of all "final decisions" rendered in rescheduling proceedings. 21 U.S.C. § 877; *see National Organization for the Reform of Marijuana Laws v. DEA,* 559 F.2d 735 (D.C.Cir.1977); *National Organization for the Reform of Marijuana Laws v. Ingersoll,* 497 F.2d 654 (D.C.Cir.1974).

10. The *Kiffer* Court itself scoffed at the idea that the "right" to sell marijuana was in any sense "fundamental." *Kiffer, supra,* 477 F.2d at 352.

11. One Supreme Court plurality has written in dictum that

> those cases that have denied certain nonconstitutional defenses to criminal defendants for failure to exhaust remedies did so pursuant to statutes that implicitly or explicitly mandated such a holding. Because of the statutes the defendants were on notice that failure to pursue available administrative relief might result in forfeiture of a defense in an enforcement proceeding.

*Moore v. City of East Cleveland,* 431 U.S 494, 497 n. 5, 97 S.Ct. 1932, 1934 n. 5, 52 L.Ed.2d

## The Telephone Counts

Numerous counts in the indictment allege that Bounos violated 21 U.S.C. § 843(b) by using the telephone to facilitate the conspiracy charged in Count I. In Bounos' view, the necessary "facilitation" could not have occurred because (1) drug conspiracies (21 U.S.C. § 846) are illegal the minute an agreement is reached;[12] and (2) each relevant call was made subsequent to the formation of the underlying agreement. Therefore, Bounos claims, each call was made after he had already committed the predicate offense alleged in the indictment, and the telephone calls must be dismissed: "One cannot facilitate a crime that has already been committed." (Defendant's brief).[13]

The flaw in Bounos' syllogism is his characterization of the conspiracy offense. The crime begins with the formation of the underlying agreement, but it does not terminate at that point; it is ongoing and continuous. A post-agreement call thus facilitates a conspiracy whenever it is "in furtherance of the conspiracy's objectives." *United States v. Thomas,* 586 F.2d 123, 131 (9th Cir.1978).[14]

## Continuing Criminal Enterprise

Count 71 of the indictment alleges that Bounos violated the "Continuing Criminal Enterprise" statute, 21 U.S.C. § 848. An individual comes with the reach of this provision when

(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is part of a continuing series of violations of this subchapter or subchapter II of this chapter—

(A) which are undertaken by such person in concert with five or more persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

*Id.,* § 848(b). Bounos argues that the following statutory terms are impermissibly vague: "part," "series," "continuing," "occupies a position of organizer, a supervisory position, or any other position of management," and "substantial income or resources." In the alternative, Bounos charges that Count 71 does little more than track the language of the statute and that it fails to give him reasonable notice of the charges. He asks for dismissal of the count.

The vagueness challenge fails. Bounos has merely asserted that section 848 is vague on its face, not as applied to his own particular situation.[15] Given this line of argument, he can succeed "only if the en-

---

531 (1977) (citations omitted). The Controlled Substances Act provides sufficient notice of an "implicit" nature. It expressly sets forth a method by which to test the propriety of cocaine's classification, thereby excluding by implication all other potential procedures. No greater form of warning appears to have been present in *McGee.*

**12.** *I.e.,* overt acts need not be alleged nor proved. *See United States v. Sweeney,* 688 F.2d 1131 at 1140, 1145 (7th Cir.1982); *United States v. Umentum,* 547 F.2d 987, 989–91 (7th Cir.1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977).

**13.** Bounos is *not* making the oft-rejected argument that conspiracy can *never* be the predicate offense under section 843(b). *See, e.g., United States v. Pierorazio,* 578 F.2d 48, 51 (3rd Cir.1978); *United States v. Barnett,* 507 F.Supp. 670, 674–75 (E.D.Cal.1981). He concedes that a conviction would be proper if, for

example, he had entered into the alleged conspiratorial agreement over the phone. *See, e.g., United States v. Rodriguez,* 546 F.2d 302, 307–08 (9th Cir.1976); *United States v. Steinberg,* 525 F.2d 1126, 1133 (2d Cir.1975), *cert. denied,* 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). Bounos' argument is more narrowly tailored to the facts of this case.

**14.** Conspiracies can have lawful, as well as illegal, objectives. Section 843(b) should not be read to criminalize calls that advance only the former. *Cf. United States v. Rodriguez, supra,* 546 F.2d at 307.

**15.** By contrast, in a supplemental memorandum raising additional arguments, Bounos asserted that section 848 "denies due process in its general approach and as applied to the facts of this case." These subsidiary contentions do not merit serious discussion.

actment is impermissibly vague in *all* of its applications." *Village of Hoffman Estates v. Flipside,* 455 U.S. 489, ——, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982) (emphasis added); *see Peick v. Pension Benefit Guaranty Corporation,* 539 F.Supp. 1025, 1059–61 (N.D.Ill.1982). Clearly, it is not, for the statute unambiguously applies in numerous fact situations. *See, e.g., United States v. Sperling,* 506 F.2d 1323, 1343 (2d Cir.1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439; 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975); *United States v. Manfredi,* 488 F.2d 588, 603 (2d Cir.1973), *cert. denied,* 417 U.S. 936, 94 S.Ct. 2651, 41 L.Ed.2d 240 (1974). I therefore join all courts which have considered this issue in holding that section 848 is not facially void for vagueness. *See United States v. Webster,* 639 F.2d 174, 182 (4th Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); *United States v. Valenzuela,* 596 F.2d 1361, 1367–68 (9th Cir.), *cert. denied,* 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979); *United States v. Cravero,* 545 F.2d 406, 410–11 (5th Cir.1976), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977); *United States v. Kirk,* 534 F.2d 1262, 1277–78 (8th Cir.1976), *cert. denied,* 430 U.S. 906, 97 S.Ct. 1174, 51 L.Ed.2d 581 (1977); *United States v. Sperling, supra,* 506 F.2d at 1343; *United States v. Sisca,* 503 F.2d 1337, 1345 (2d Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974); *United States v. Manfredi, supra,* 488 F.2d at 602–03; *United States v. Holman,* 490 F.Supp. 755, 758 (E.D.Pa.1980); *United States v. Bergdoll,* 412 F.Supp. 1308, 1316–17 (D.Del.1976); *United States v. Collier,* 358 F.Supp. 1351, 1355–56, *affd. per curiam,* 493 F.2d 327, 329 (6th Cir.), *cert. denied,* 419 U.S. 831, 95 S.Ct. 56, 42 L.Ed.2d 57 (1974).

Bounos' challenge to the indictment similarly lacks merit. He claims he has been prejudiced by Count 71's failure to specify the specific felonies constituting the alleged "continuing series," and the persons with whom he allegedly acted in concert. The caselaw offers no support for these arguments. Identical claims were labelled "little short of fatuous" in *United States v. Sperling, supra,* 506 F.2d at 1344. Other courts have also rejected Bounos' plea in whole or in part. *See United States v. Johnson,* 575 F.2d 1347, 1356 (5th Cir.1978), *cert. denied,* 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed.2d 454 (1979); *United States v. Bergdoll, supra,* 412 F.Supp. at 1318; *see also United States v. Jeffers,* 532 F.2d 1101, 1113 (7th Cir.1976), *affirmed in part, vacated in part, and remanded on other grounds,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977). I see no reason to deviate from these holdings.[16]

### Order

For the reasons stated, Bounos' motions to dismiss the indictment under the Fifth Amendment, to dismiss the telephone counts, and to dismiss Count 71 are denied. Browning's motion to dismiss the indictment on reclassification grounds is also denied.

It is so ordered.

---

**16.** Bounos' reliance upon *United States v. Hinkle,* 637 F.2d 1154 (7th Cir.1981), involving 21 U.S.C. § 843(b), is misplaced. To the extent that decision has relevance for indictments under section 848, it merely indicates that the Government must specify (1) "the controlled substance involved" in the predicate crimes comprising the alleged "continuing series of violations"; and (2) "some sort of statement" describing these underlying offenses. 637 F.2d at 1158. The present indictment passes this test. It identifies the drug involved (cocaine), and the generic types of offenses that Bounos allegedly committed (distributing cocaine, possessing cocaine with intent to distribute, and using the telephone to facilitate a conspiracy to distribute cocaine and to possess cocaine with intent to distribute). *Hinkle's* additional requirements for section 843(b) indictments— that they specify the "type of communication facility used" and "the date on which it was used," *id.*—refer to elements of the section 843(b) offense that have no analogue in section 848.